UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BRB CONTRACTORS, INC.,<br><br>　　　　　　Plaintiff,<br>　vs.<br>WEB WATER DEVELOPMENT ASSOCIATION, INC.,<br><br>　　　　　　Defendant. | CIV. NO. 19-4095<br><br>**MEMORANDUM OPINION AND ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Pending before the Court is Plaintiff BRB Contractors, Inc.'s ("BRB") Motion for Partial Summary Judgment seeking an order from the Court that any damages suffered by Defendant WEB Water Development Association, Inc. ("WEB") from its counterclaim alleging breach of contract are limited to "the reasonable cost of restoration, unless such cost is greater than the diminution in value of the [ ] premises, in which case the difference in market value before and after injury would be the proper measure of damages."  (Doc. 32 at 1) (quoting *Reed v. Consolidated Feldspar Corp.*, 23 N.W.2d 154, 157 (S.D. 1946)).  In addition, in its Motion, BRB asks the Court to rule that WEB has not sustained any damages related to the post-construction condition of the landowners' topsoil conditions because WEB voluntarily incurred costs to reclaim the topsoil without claims or lawsuits asserted by the landowners.  For the following reasons, BRB's Motion for Partial Summary Judgment is denied.

## BACKGROUND

WEB Water Development Association, Inc. ("WEB") is rural water system containing approximately 6,800 miles of pipe spanning an area approximately 9,300 square miles. (Doc. 38, ¶ 2).  WEB, as the owner, and BRB Contractors, Inc. ("BRB"), as the contractor, entered into a written contract effective August 24, 2017 (the "Contract") for the construction of a 3-mile underground water pipeline near Bowdle, South Dakota ("the Project").  (Docs. 33, ¶ 1; 35, ¶ 1). WEB separately retained DGR Engineering ("DGR") to serve as the Project Engineer for the Project. (Docs. 33, ¶ 2; 35, ¶ 2).

1

The Project crosses 6 farms and WEB acquired pipeline easements from each of the fee-simple landowners for the construction of the Project, as well as temporary easements to access the construction sites.  (Docs. 33, ¶ 3; 35, ¶ 3; 34-2, Hammrich Dep. 16:5-9).  WEB did not pay any compensation to the landowners to obtain the easements.  (Docs. 33, ¶ 4; 35, ¶ 4).

The Contract provides that BRB will complete all work as specified in the Contract Documents, including specifications detailed in the Project Manual, and that WEB will make progress payments prior to Substantial Completion of the Project.  (Docs. 34-1 at A-1, A-5).  Upon Substantial Completion, the Contract provides that WEB "shall pay BRB an amount sufficient to increase total payments to [BRB] to 95 percent of the Work completed, less such amounts set off by [WEB] pursuant to Paragraph 15.01.E of the General Conditions, and less 200 percent of Engineer's estimate of the value of Work to be completed or corrected as shown on the punch list of items to be completed or corrected prior to final payment."  (Doc. 34-1 at A-3).  The Project Manual prepared by DGR provided that "[t]opsoil shall be salvaged and replaced on the trenches to a minimum depth of 6" and shall be graded and shaped to original condition."  (Doc. 40-6 at 2-14).  Per the Contract's terms, BRB was required to add topsoil if necessary to meet completed requirements.  (Doc. 40-6 at 2-31).  Topsoil is defined by the Contract as "soil typical of the area, which is capable of supporting native plant growth."  (Doc. 40-6 at 2-32).

WEB does not have any agreements with landowners concerning the quality of the topsoil on the easements after construction, but made crop reimbursement payments to certain landowners for the 2018 season.  (Docs. 33, ¶¶ 5, 7; 35, ¶¶ 5, 7).  BRB is not obligated to pay the landowners or reimburse WEB for those crop reimbursement payments (Docs. 33, ¶ 5; 35, ¶ 5).

 On November 1, 2018, representatives of WEB, BRB, and DGR conducted the final walkthrough for the Project.  (Docs. 33, ¶ 8; 35, ¶ 8).  WEB agreed that all items on the punch list dated November 1, 2018, had been completed except for items 4 and 11, both of which were to be completed later in the warranty period.  (Docs. 33, ¶ 8; 35, ¶ 8).  Although the punch list did not mention the condition of the topsoil, that subject had previously been brought to the attention of BRB prior to November 1, 2018.  (Docs. 33, ¶ 8; 35, ¶ 8).  Specifically, on June 5, 2018, DGR prepared a daily field observation report in which BRB was "reminded of the 6" minimum topsoil specification" found in the Project Manual.  (Doc. 40-2, Pabolo Dep. 17:16-18:23).  WEB had received complaints from some landowners about the Project and the condition of the topsoil over

the easements. Specifically, on September 20, 2018, one of the landowners wrote to WEB informing them of the following:

> I was informed this spring that Agtegra would no longer be able to continue the test plot contracts in the same area used in previous years due to the digging of WEB water lines & soil composition after digging had commenced. The Agtegra rep stated that this ground had been disturbed to the point that it will likely take 5 years or more to recover to the original density/composition as it was before digging began.
>
> I have therefore lost the income from those contracts—not to mention the benefits that these test plots would have shown us for the different varieties of crops grown on that particular type of soil. These losses are not only for the 2018 growing season, but for a number of years down the road.
>
> We also want to restate our frustrations with the entire digging process—from the integration of sand/gravel into original soil content, to the destruction of posts & fences, damages to driveways, and of course there's the loss of grazing from the 2017 fall grazing season since this project has been ongoing for over a year!! Seems rather strange that some parts of this project can be completed in 2 weeks while the destruction on our property continues for months & months. Before this project started, we were told by WEB representatives that the project was estimated to take a couple of months at most, and that the groundwork, fences, driveways, etc. would be restored to pre-project condition. After digging up parts of the same line for a third time, it is apparent that none of the conditions we were lead to believe (before this project began) will be met.

(Doc. 40-1). Dustin Pabolo, the onsite foreman for the Project, recalls that a section of pipe was dug up several times because the water service kept breaking. (Doc. 40-2, Pabolo Dep. 5:18-20; 28:2-19). Mr. Pabolo testified that soil was insufficient to support the weight of the water service on the vertical 1-inch line which had snapped under the weight. (Doc. 40-2, Pabolo Dep. 28:2:19).

On November 2, 2018, after the final walkthrough, WEB notified DGR that one of the landowners had called WEB "regarding topsoil issues," and DGR engineer Nathan Brandenburg emailed that information to BRB employee Brandon Pabolo. (Docs. 33, ¶ 9; 35, ¶ 9). On November 14, 2018, DGR engineer Nathan Brandenburg sent WEB employee Eric Hansen an email that stated:

> Eric,
>
> Based off out [*sic*] conversation yesterday, I came up with the following potential payment scenarios based off of land values.
>
> Assumptions:

3

>100 linear feet of pipeline installation.
>10 linear feet wide area.
>$3033 per acre land evaluation for non-irrigated cropland in Edmunds County (2017 average according to SDSU)
>
>1000' x 10' / 43650 acre/ft2 = 0.23 acres
>0.23 acres x $3033 per acre = $697.59
>
>For example, Dewald's property crossing is about 2600' long and assuming an average width of 10' across the entire property. So the payment would be approximately $1,813.73.
>
>Let me know if you have any thoughts or suggestions for adjustments.
>
>Thanks,
>
>Nathan A. Brandenburg, PE

(Docs. 33, ¶ 11; 35, ¶ 11). In response to Mr. Brandenburg's email, Mr. Hansen replied:

>Nathan,
>
>Do you think you could do an estimate of what it might cost of it was completed the correct way by removing the clay that is placed on the existing topsoil? I know this would involve rolling topsoil to one side and putting topsoil back on trench area.

(Doc. 35, ¶ 11).

On November 13, 2018, WEB received a proposal from a construction company in Aberdeen to correct the topsoil issues and on December 3, 2018, received another estimate from B&B Contracting for $151,000 to remedy topsoil issues in 7,920 lineal feet of the easement across the Dewalds' and Hubers' property. (Doc. 34-2, Hammrich Dep. 60:7-61:20).

On December 3, 2018, BRB informed Nathan Brandenburg at DGR by email that he had reached verbal agreements with two landowners, the Hubers and the Dewalds, resolving potential topsoil issues. (Docs. 33, ¶ 10; 35, ¶ 10; 40-7). Specifically, BRB and the Hubers verbally agreed that BRB would provide the Hubers with eight to ten loads of topsoil to correct any topsoil deficiencies on their property. (Doc. 34-7 at 4; 40-7). BRB would pay Hubers for their time and equipment to spread the topsoil. (Doc. 40-7). BRB's agreement with the Dewalds was to have a neighbor rip his field in the spring as he felt his ground was too compacted and disk in manure. (Doc. 40-7).

When this December 3, 2018, email was passed along to Ms. Hammich at WEB, she inquired whether BRB's proposal adheres to the specifications in the Contract and Mr. Brandenburg responded as follows:

> The specifications do not require a specific method for fixing a top soil issue. Which goes back to not controlling means and methods. The specifications callout an end product and in this case, a minimum depth of 6 inches of topsoil and no greater than 12" of grade change above the trench (which cannot extend more than 2 feet on either side of the trench and must provide adequate drainage). For your information I am referencing Section 02221, Paragraphs 3.05.C.2.b and 3.05.C.5. Section 02246 Paragraph 2.01.B. says that topsoil is considered to mean soil typical of the area, which is capable of supporting native plant growth. At this point I don't believe we know enough to say if there will or will not be adequate topsoil after the work is complete.

(Doc. 40-7). Ms. Hammrich responded that WEB expected BRB to "adhere to the specs." (Doc. 40-7).

On December 26, 2018, Nathan Brandenburg with DGR sent an email to BRB stating, in part: "WEB has reviewed your proposed plan for topsoil repair, and is not willing to accept the proposed plan…." (Doc. 34-7 at 3).

On February 5, 2019, WEB "terminated" the Contract based on BRB's alleged failure to comply with the Project specifications' provisions for topsoil quantity and placement. (Docs. 33, ¶ 13; 35, ¶ 13). On May 30, 2019, BRB filed its complaint in this lawsuit alleging that WEB materially breach the Contract by (a) wrongfully terminating the Contract on or around February 5, 2019; and (b) failing to pay BRB in a timely manner. (Doc. 1, ¶¶ 24-28). BRB is seeking to recover $214,743.94 on the unpaid contract balance plus interest and $41,850 in liquidated damages. (Doc. 34-2, Hammrich Dep. 80:13-20; Doc. 1, ¶ 21). In addition, BRB alleges a claim for breach of the covenant of good faith and fair dealing when WEB: (1) wrongfully declared BRB in default and wrongfully terminated the Contract; (2) declared BRB in default and terminated the Contract as a pretext to avoid paying the unpaid Contract balance to BRB; (3) knew at the time it declared BRB in default and terminated the Contract, that it was impossible for either BRB or WEB to address the alleged topsoil deficiencies until the winter weather conditions improved; (4) failed to allow BRB an adequate opportunity and reasonable amount of time to correct the alleged topsoil cover depth deficiencies as provided in Section 15.08.A of the General Conditions." (Doc. 1, ¶¶ 29-34). BRB also alleges a claim against WEB for unjust enrichment. (Doc. 1, ¶¶ 35-39).

On July 9, 2019, WEB filed its Answer to the Complaint. (Doc. 8). On August 23, 2019, WEB filed a Counterclaim against BRB alleging a claim for breach of contract. (Doc. 17). In its Counterclaim, WEB alleges that BRB failed to comply with the requirements of the Contract by failing to adhere to the site reclamation and topsoil quantity and placement requirements of the Contract. (Docs. 33, ¶ 14; 35, ¶ 14; 17, ¶¶ 2-3). WEB alleged in its counterclaim that "[i]t is anticipated [BRB's] failure to comply with the terms of the contract will result in [WEB] expending more funds to correct the problem than the amount [WEB] is currently withholding from [BRB]" and claims that it is entitled to damages to correct the issues created by BRB's alleged breach of contract. (Doc. 17, ¶¶ 5-6).

On September 3, 2019, one of the landowners sent an email to WEB indicating their dissatisfaction with the Project as follows:

> My husband . . . and I are the owners of the property that is currently under the dispute with WEB Water. The 4 1/2 acres . . . has apparently caused many problems for him in recent years. In my visits during the last two years, I have witnessed the disruption in his farming of this land that was caused by WEB water improvements. It seems that our land was greatly more impacted than some others around us. Consequently this matter could affect us.
>
> I hope that you are able to resolve this issue with Pat as soon as possible. I believe he deserves what he is requesting!

(Doc. 40-3).

On January 31, 2020, WEB received a proposal from B&B Contracting (not to be confused with BRB) for topsoil "reclamation[1]" work conducted along approximately 1.5 miles of the Project as well as damages for "topsoil quantity and placement." (Docs. 33, ¶ 15; 35, ¶ 15; 34-12). The reclamation work by B&B Contracting was performed between July 16, 2020 and July 31, 2020. (Doc. 34-13). As part of its Counterclaim, WEB is seeking damages for the $18,000.00 it paid to B&B Contractors to "salvage topsoil," the $48,604.50 it paid to "remove clay," and $155,800.00 it paid to "furnish and place topsoil" on the Project easement. (Docs. 33, ¶ 16; 35, ¶¶ 16; 34-13).

---

[1] BRB states that the "reclamation" consisted of scraping the top 6" topsoil material of the surface, removing "clay" and re-leveling the remaining native soil, and then importing and placing additional topsoil over the right-of-way. (Docs. 32 at 1; 34-13).

Landowners have not made any claims against WEB for damage to their land caused by the Project, nor are there any agreements between WEB and the landowners concerning the topsoil on their properties. (Docs. 34-2, Hammrich Dep. 22:11-23:6; 33, ¶ 6; 35, ¶ 6).

## DISCUSSION

### A. Parties' Arguments

As part of its Counterclaim, WEB is seeking to recover the $222,404.50 it paid to B&B Contractors for its reclamation efforts which consisted of: $18,000.00 to "salvage topsoil;" $48,604.50 to "remove clay;" and $155,800.00 to "furnish and place topsoil" on the Project easement. (Docs. 33, ¶ 16; 35, ¶ 16; 34-14).

BRB designated South Dakota-licensed appraiser Steven C. Shaykett as its testifying expert on the market value of the land subject to WEB's easements. (Doc. 33, ¶ 17; 35, ¶ 17). WEB has not identified any expert to opine on the market value of the properties. (Docs. 33, ¶ 17; 35, ¶ 17; 34-10). Mr. Shaykett has opined that the market value of land subject to WEB's pipeline easements prior to the construction of the easement averaged $2,871 per acre. (Docs. 33, ¶ 18; 35, ¶ 18). Based on that estimate, the total market value of the property reworked by B&B Contracting (based upon the 50' easement width over approximately 1.5 miles in length, at the average market value of $2,871 per acre) prior to construction was $26,126.10. (Docs. 33, ¶ 19; 35, ¶ 19; 34-10).

BRB has moved for partial summary judgment on the issue of damages. (Doc. 31). In its memorandum in support of its motion, BRB argues that South Dakota law does not allow WEB to recover its asserted "reclamation costs" because those costs grossly exceed the market value of the property. (Doc. 32 at 2). BRB also argues that WEB has not sustained damages from the topsoil conditions because WEB voluntarily incurred the cost to reclaim the topsoil. (Doc. 32 at 2). BRB asks the Court to rule as a matter of law that WEB's damages for the topsoil reclamation are limited to the lesser of either the reasonable cost of restoration or the diminution in value of the property involved. (Doc. 32 at 2) (citing *Metz Farms v. Fisher Sand & Gravel Co.*, Civ. No. 12-4005, Doc. 56 at *1 (D.S.D. Aug. 19, 2013) (J. Piersol) (citing *Reed v. Consolidated Feldspar Corp.*, 23 N.W.2d 154, 157 (S.D. 1946)).

WEB argues in opposition that it has a right to recover expenses to bring the Project into compliance with the terms of the Contract. WEB argues that under the Contract's General

7

Conditions, BRB's obligation to perform and complete the work was absolute, whether or not BRB entered into separate deals with any landowners. (Doc. 37 at 4). Specifically, Paragraph 7.17C of the Contract provides:

> Contractor's obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute. None of the following will constitute an acceptance of Work that is not in accordance with the Contract Documents or a release of Contractor's obligation to perform the Work in accordance with the Contract Documents:
>
> 1. observations by Engineer;
> 2. recommendation by Engineer or payment by Owner of any progress or final payment;
> 3. the issuance of a certificate or Substantial Completion by Engineer or any payment related thereto by Owner;
> 4. use or occupancy of the Work or any party thereof by Owner;
> 5. any review and approval of a Shop Drawing or Sample submittal;
> 6. the issuance of a notice of acceptability by Engineer;
> 7. any inspection, test, or approval by others; or
> 8. any correction of defective Work by Owner.

(Doc. 37 at 3-4). WEB argues that "[i]nstead of agreeing WEB has a right to recover expenses to bring the Project into compliance with the terms of the contract, BRB takes the position that WEB is only entitled to recover damages based upon the diminution in the value of property owned by the landowners who granted easements." (Doc. 37 at 4). WEB argues that the cases relied upon by BRB to support its argument that damages should be based upon the diminution of the value of property are inapposite because they involve situations where the owner of the land was seeking damages. (Doc. 37 at 4). WEB argues that it is inappropriate to award it damages for the diminution of property that it does not own. (Doc. 37 at 4).

Citing to the Affidavit of Angie Hammrich, WEB argues that its damages "go[] far beyond the diminution in the value of the land covered by the easements." (Doc. 37 at 4). In her Affidavit, Ms. Hammrich attests that WEB has been approved for two expansion projects through USDA Rural Development. (Doc. 38). One of those projects is to allow water to be provided to areas which are currently under a moratorium for expansion due to lack of capacity to serve those areas. (Doc. 38). In order to expand the system, Ms. Hammrich attests that WEB will have to obtain additional easements, and that the quality of the work done by contractors hired by WEB and how the land is left after the completion of a project impacts the willingness of landowners to grant

easements. (Doc. 38). WEB does not pay for easements and Ms. Hammrich attests that if a landowner refuses to grant an easement, "WEB may have to reroute a project which can result in thousands of dollars of additional costs." Ms. Hammrich attests that the Bowdle Mainline Project, which is the subject of this lawsuit, runs along U.S. Highway 12 and is highly visible to the general public, including landowners from whom WEB may need to seek easements for future projects. (Doc. 38). She further attests that she has viewed a video[2] provided by BRB of a flight over the Project area which shows that the area over the top of the trench to be in poor condition and that WEB's goal is to return easement areas for WEB's infrastructure to the same condition as they were in before construction began. (Doc. 38). In addition, in his Affidavit, Eric Hanson, the construction manager for WEB, attested that he heard complaints from landowners in the area about the poor condition of the easement area, although it is not totally clear if they were objecting to the quality of the topsoil or other issues with that area. (Doc. 39).

In its Reply Brief, BRB argues that even if the Court was to assume that BRB did not meet the Project topsoil placement specifications, it is the landowners, and not WEB, who have suffered detriment from that deviation. (Doc. 41 at 11). BRB argues that WEB's purported concern about an inability to obtain future easements is purely speculative. (Doc. 41 at 11).

**B. Analysis**
    **a. Voluntary Payment Doctrine**

In its Motion for Partial Summary Judgment, BRB asks the Court to rule that under the voluntary payment doctrine, WEB has not sustained any damages related to the post-construction condition of the landowners' topsoil because WEB voluntarily incurred costs to reclaim the topsoil without any claims or lawsuits asserted by the landowners. (Doc. 32 at 12).

"The voluntary payment doctrine provides that 'as between [person] and [person], money paid voluntarily, with knowledge of all the facts, and without fraud or duress, cannot be recovered merely on account of ignorance or mistake of law.'" *Putnam v. Time Warner Cable of S.E. Wis., Ltd. Partnership*, 649 N.W.2d 626, 632 (Wis. 2002) (quoting *Putnam*, 633 N.W.2d 254 (Wis. Ct. App. 2001)). "The doctrine has been applied in several diverse contexts to preclude actions to recover payments that parties paid voluntarily, with full knowledge of the material facts, and absent fraud or wrongful conduct inducing payment." *Id.*; *see also Siefkes v. Clark Title Co.*, 215

---

[2] It is unclear from the record when this video footage was recorded.

N.W.2d 648, 651 (S.D. 1974) (stating that under the voluntary payment doctrine, "money voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment cannot be recovered on the ground that the claim was illegal or that there was not liability to pay in the first instance.").

The Court does not find that the voluntary payment doctrine applies in this case. The voluntary payment doctrine is typically raised as a defense by the party who received the payment to preclude the payor from reclaiming his money. *See Best Buy Stores v. Benderson-Wainberg Assocs.*, 668 F.3d 1019, 1030 (8th Cir. 2012) (stating that the voluntary payment doctrine is an affirmative defense that "provides that one who makes a payment voluntarily cannot recover it on the ground that he was under no legal obligation to make the payment."); *Smith v. Prime Cable of Chicago*, 658 N.E2d 1325, 1330 (Ill. Ct. App. 1995) (quoting 66 Am.Jur.2d *Restitution & Implied Contracts* § 94, 1035-36 (1973) ("When the person making the payment can only be reached by a proceeding at law, he is bound to make his defense in the first instance, and he cannot postpone the litigation by paying the demand in silence or under a reservation of right to litigate the claim, and afterward sue to recover the amount paid.")). These are not the facts here. As noted by the Supreme Court of Wisconsin, there are two primary reasons why courts have adopted the voluntary payment doctrine. *Putnam*, 649 N.W.2d at 633. First, the doctrine allows entities that receive payment for services to rely upon these funds and to use them unfettered in future activities. *Id.* Second, the doctrine operates as a means to settle disputes without litigation by requiring the party contesting the payment to notify the payee of its concerns. *Id.* After such notification, a payee who has acted wrongfully can react to rectify the situation. *Id.* These considerations do not apply to a situation such as this one where the money paid by WEB for the reclamation was to a third party and where WEB is not seeking a return of its money.

   a. **Appropriate Measure of Damages**

BRB also argues that the Court should rule as a matter of law that WEB's damages for its breach of contract counterclaim is limited to the lesser of: the reasonable cost of restoration or the

diminution in market value of the agricultural land covered by the easement resulting from any alleged breach of the topsoil specifications.³  (Doc. 32 at 2).

SDCL 21-2-1 sets forth the general measure of damages in a contract dispute as "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, of which, in the ordinary course of things, would likely to result therefrom."  SDCL 21-2-1.  "No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin."  SDCL 21-2-1.  The purpose of contract damages is to put the injury party in the same position it would have been in had there not been a breach, and a party cannot recover more than what the party would have gained by full performance by both sides.  *Casper Lodging, LLC v. Akers*, 871 N.W.2d 477, 490 (S.D. 2015); SDCL 21-1-5.  "Damages must in all cases be reasonable[.]  SDCL 21-1-3.

Damages must not be speculative, but must be reasonably certain.  *Excell Underground, Inc. v. Brant Lake Sanitary Dist.*, 941 N.W.2d 791, 805 (S.D. 2020).  To satisfy this requirement, a plaintiff must establish "a reasonable relationship between the method used to calculate damages and the amount claimed."  *McKie v. Huntley*, 620 N.W.2d 599, 603 (S.D. 2000).  "In applying this rule, [courts] refrain from dictating any specific formula for calculating damages.  Instead, [courts] apply a 'reasonable certainty test concerning the proof needed to establish a right to recover damages.'"  *Id.* (citation omitted).  The reasonable certainty standard requires there to be proof of a rational basis for measuring loss, without allowing a jury to speculate.  *Id.*  "Whether damages have been proven with reasonable certainty is a question of fact."  *FB & I Bldg. Products, Inc. v. Superior Truss & Components,* 727 N.W.2d 474, 480 (S.D. 2007).

Cost of repair damages have been recognized as an appropriate measure of damages by the South Dakota Supreme Court in construction defect cases "[i]f the contract is substantially performed, and the breach of contract can be remedied without taking down and reconstructing a substantial portion of" the work.  *See Northern Farm Supply Inc. v. Sprecher*, 307 N.W.2d 870, 873 (S.D. 1981) (citation omitted); *Subsurfco, Inc. v. B-Y Water Dist.*, 337 N.W.2d 448, 455 (S.D.

---

³ BRB argues that the reclamation costs expended by WEB in the amount of $222,404.50 greatly exceeds the total market value of the land covered by the easement prior to the reclamation efforts, which its expert estimates to be no more than $26,126.

1983). In the present case, WEB seeks damages in $222,404.50 for what it expended to bring the Project into compliance with the topsoil specifications.

At trial, BRB, the defendant in WEB's breach of contract counterclaim, will have the burden to "present any contradictory evidence challenging the reasonableness or proportionality of those damages and where appropriate, evidence of an alternative measure of damages for the jury's consideration." *Casper Lodging, LLC*, 871 N.W.2d at 491-92. South Dakota courts have recognized that a breaching party may prove the unreasonableness or disproportionality of cost of repair damages by proving that such damages are outweighed by the diminution in value of the property resulting from the breach. *See Big Rock Mtn. Corp. v. Stearns-Roger Corp.*, 388 F.2d 165, 168-69 (8th Cir. 1968) (applying South Dakota law); *Northern Farm Supply Inc.*, 307 N.W.2d at 873. Some methods of proving diminution of value that have been recognized by courts include: demonstrating that, in the case of substantial completion, the destruction of usable property would be disproportionate to the benefit to be attained by remedying the defect, *Northern Farm Supply Inc.* 307 N.W.2d at 873; demonstrating that, in the case of substantial completion, the diminution value of the thing to be built according to contract specifications is less than the cost of repair, *Id.* and *Ward v. LaCreek Elec. Ass'n*, 163 N.W.2d 344, 349 (S.D. 1968); or demonstrating that the diminution in value of real property is disproportionate to the cost of restoration or repair, *Reed v. Consolidated Feldspar Corp.*, 23 N.W.2d 154, 157 (S.D. 1946). A breaching party may also show the unreasonableness of the costs incurred by proving less expensive alternatives to comply with contract specifications. *See BLB Aviation S.C., LLC v. Jet Linx Aviation, LLC*, 808 F.3d 389, 393 (8th Cir. 2015) (finding that the availability of cheaper alternatives to remedying defendant's breach was disproportional to the cost of repair).

There is no evidence in the record on summary judgment that BRB has introduced any evidence that the topsoil specifications along the easement area could have been met at a cost less than the restoration/repair costs incurred by WEB. Instead, BRB seeks to demonstrate at trial that the cost of restoration/repair in this case is disproportionate to the diminution in market value of the agricultural land resulting from the breach. The diminution in market value of real property was recognized by the South Dakota Supreme Court as an alternative measure of damages in a breach of contract case in *Reed v. Consolidated Feldspar Corp.*, 23 N.W.2d 154 (S.D. 1946). In *Reed,* the court held that the measure of damages for a mining lessee's breach of the lease covenant

to mine "carefully and in a workmanlike manner" was the "reasonable cost of restoration, unless such cost is greater than the diminution in value of the leased premised, in which case the difference in market value before and after the injury would be the proper measure of damages." *Id.* at 157.

However, as WEB points out, unlike in *Reed* and other South Dakota cases applying this measure of damages, WEB is not the owner of the agricultural land at issue in this case. Accordingly, WEB argues that the diminution of market value in the agricultural land is not a proper measure of damages because it does not measure loss in value to WEB caused by BRB's alleged breach, but rather measures the loss in value to the landowners who are not parties to the contract. WEB cites to *Subsurfco v. B-Y Water Dist.*, 337 N.W.2d 448 (S.D. 1983) in support of its argument. There, the South Dakota Supreme Court held that in a counterclaim by the water district for costs to complete a defective water pipe, the proper measure of damages was the "difference in value between what it would have been built according to contract and what was actually built," not the difference in the market value of the land upon which the pipeline ran. *Id.* at 455. WEB argues that because BRB has not produced any evidence demonstrating the difference in value of the Project if it would have met the topsoil specifications versus what was actually built, BRB has not proven an alternative measure of damages and accordingly, the cost of restoration should be the only instruction given to the jury.

BRB has not cited to any cases in which a court has recognized the diminution in value of real property as an alternative way to measure the loss suffered by a party, such as WEB, who is not the landowner. However, whether BRB's measure of damages is a rational basis for measuring WEB's loss is not before the Court on summary judgment and the Court is not willing to make that determination at this juncture. *See Lord v. Hy-Vee Food* Stores, 720 N.W.2d 443, 454 (S.D. 2006) ("The reasonable certainty standard requires there to be proof of a rational basis for measuring loss, without allowing a jury to speculate."). The jury will not, however, be instructed on diminution in value absent a finding by the Court that BRB's measure of damages is a reasonable basis for measuring WEB's loss. *Big Rock Mtn. Corp. v. Stearns-Roger Corp.*, 388 F.2d 165, 170 (8th Cir. 1968) ("The refusal of plaintiff to offer proof of the amount of damages based on the cost of restoration plus loss of use rule left the trial court with no alternative but to direct the verdict for the defendant."); *Montara Owners Ass'n v. La Noue Dev., LLC*, 353 P.3d

13

563, 573 (Or. 2015) (holding that it was error to give part of the instruction that dealt with economic waste since there was no evidence of diminution in value); *Kelley v. Widener Concretes Const., LLC*, 401 S.W.3d 531, 541 (Mo. Ct. App. 2013) ("If the contractor fails to present any evidence of the diminution in value of the property, the contractor fails to meet its burden.").

BRB moves the Court on summary judgment to rule as a matter of law that WEB's damages are limited to the lesser of the reasonable cost of restoration or the diminution in market value of the agricultural land covered by the easement resulting from any alleged breach of the topsoil specifications. In *Big Rock Mountain Corp. v. Stearns-Roger Corp.*, the court stated that "if the facts show that either of two measures of damages will fully compensate plaintiff for his loss, that measure must be adopted which is less expensive to defendant." 388 F.2d at 170 (quoting 22 Am.Jur.2d *Damages* § 135 (1965)). What the court is able to conclude at this juncture is that it is not clear as a matter of law that the measure of damages proposed by BRB "wholly compensates" WEB for any losses it may have suffered. Therefore, the Court will not rule as a matter of law WEB's damages for its counterclaim are limited to the lesser of the restoration costs or the diminution in market value of the agricultural land covered by the easement.

Accordingly, it is hereby ORDERED that BRB's Motion for Partial Summary Judgment (Doc. 31) is DENIED.

Dated this 11th day of February, 2021.

BY THE COURT:

_____
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

_____